UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

Hue-Mar, LLC, et al                                            Civil Action No. 6:07-0635

versus                                                      Judge Tucker L. Melançon

FreedomRoads Operations Company, LLC, et al                Magistrate Judge Methvin

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment, filed by defendant Bank of America, N.A. [Rec. Doc. 74], an opposition to the motion filed by plaintiff, Hue-Mar, LLC d/b/a Campers Unlimited of Breaux Bridge ("Hue-Mar") [Rec. Doc. 101] and Bank of America's reply memorandum [Rec. Doc. 104]. For the reasons that follow, the motion will be denied.

### *I. Background*

The factual background and procedural history of this case have been thoroughly set forth by the Court in several previous rulings. *R. 29; 109.* Rather than repeat its entirety, the Court will summarize the relevant undisputed facts as provided in defendant's statement of uncontested facts, *R. 74,* and plaintiff's response thereto, *R. 101,*:

Plaintiff, Hue-Mar, alleges that on September 27, 2005, less than one month after Hurricane Katrina and a few days after Hurricane Rita, it entered into a contract captioned "Letter of Intent" ("LOI") with FreedomRoads Operations Company, LLC, a Minnesota company with its principal place of business in Illinois. In the

LOI, Hue-Mar agreed to sell all of its assets to FreedomRoads for an agreed-upon price of $315,000, with appropriate adjustments for inventory.

Hue-Mar contends that FreedomRoads directed Hue-Mar to deal with its wholly-owned New Jersey-based subsidiary, Meyer's RV Centers, LLC. The actual sale of assets was deferred; instead, the immediate effect of the agreement was to give FreedomRoads access to he high Louisiana market demand for campers, trailers and RV's. Hue-Mar had a Louisiana RV Dealers license issued by the Louisiana Recreational and Used Motor Vehicle Commission, and it also had facilities, staff and inventory based in Louisiana.

Prior to entering into the LOI with Hue-Mar, Freedom Roads entered into a loan agreement with Bank of America ("the Bank") on June 9, 2006 entitled "Floor Plan Credit Agreement" (the "Floor Plan Loan"). The Floor Plan Loan is secured by a Security Agreement in which Freedom Roads granted a security interest in and over various types of property, including all of Freedom Roads' inventory.

In September 2005, FreedomRoads informed Bank of America of its intent to acquire the assets of Hue-Mar. During this same time, FreedomRoads asked the Bank to amend its Floor Plan Loan so that it could sell RV inventory to FEMA. In order to accommodate this request, the Floor Plan Loan was amended on September 21, 2005 and additional financing was made available to FreedomRoads. In order for FreedomRoads to consign some of its RV inventory to Hue-Mar so Hue-Mar could sell that RV inventory in Louisiana, Bank of America required FreedomRoads to have Hue-Mar execute a Consignment Agreement which protected the Bank's

interest in any of that inventory subject to the Floor Plan Loan. The Consignment Agreement identifies Meyer's RV Centers, LLC as the owner of the RV inventory described therein. Bank of America also required that Hue-Mar, as the consignee, acknowledge its understanding of the consignment relationship and agree to the Bank's rights as a floor plan lender through the execution of a "Consignee Estoppel Agreement" on September 28, 2005. In the Consignee Estoppel Agreement, Hue-Mar, as Consignee, agreed and acknowledged to the Bank that:

1. The Consignment Agreement is the only agreement between Consignee and Consignor (Meyer's RV Centers, LLC) under which inventory . . . will be delivered to Consignee by Consignor. . . .

3. Consignee consents to . . . Bank's security interest in the Consigned Products. Consignee will continue to remit all payments directly to Consignor until Consignee receives other written instructions from Bank, after which Consignee will remit all payments directly to Bank or as otherwise instructed.

4. Consignee agrees that Consignee's obligation to remit proceeds from the sale of consigned Products to Bank. . .is absolute and unconditional, and is independent of the performance by Consignor of its obligations under the Consignment Agreement or otherwise. Consignee will make all such payments to Bank regardless of, and will not assert against Bank, any defense, claim, counterclaim, set-off, recoupment, abatement or other right, existing or future, which Consignee may have against Consignor or any other person or entity. . . .

5. . . . Consignee is obligated to remit all proceeds from the sale of Consigned Products to Bank. . . regardless of any failure of Consignor or any other person to perform any obligations under the Consignment Agreement, or any related instrument or agreement.

. . . .

In addition to the Consignment Agreement and the Consignee Estoppel Agreement, Meyer's RV Centers, LLC executed an "Assignment of Consignment

3

Agreement" with Bank of America, wherein Meyer's RV Centers, LLC assigned all proceeds that it would receive from the consigned RV inventory to Bank of America, so the Bank could collect its floor plan finance costs and principal borrowings on that inventory. Bank of America also delivered a "Consignment Notification" to Hue-Mar's floor plan lender, Farmers Merchants Bank & Trust Company, which informed that bank that the RV inventory being consigned to Hue-Mar was subject to a security interest in favor of Bank of America.

On September 30, 2005, Hue-Mar filled out and delivered to Bank of America a "Dealer Application" so that it could begin referring customers to the Bank for the retail financing of their RV's. Hue-Mar was approved by Bank of America and Hue-Mar and the Bank executed a "Bank of America Specialty Group Retail Plan Dealer Agreement," (the "Retail Agreement"). The Retail Agreement enabled the Bank to review those applications for credit that Hue-Mar choose to forward to Bank of America from its retail customers.

On October 27, 2005, Hue-Mar as "Assignor" executed an Instrument of Assignment in favor of Bank of America as "Assignee" ("the October Assignment"). The October Assignment provided in relevant part:

> WHEREAS, Assignor has sold to the United States Federal Emergency Management Agency ("FEMA")/General Services Administration ("GSA") certain inventory that is the collateral of Assignee; and
>
> WHEREAS, Assignor has agreed to assign to Assignee all of its rights to payments arising out of the sale of inventory to FEMA/GSA.
>
> . . . .

4

[1] the parties agree as follows:

  1. <u>Assignment</u>. Assignor does grant, bargain, sell, deliver, assign, convey , and transfer to Assignee all of Assignor's right, title and interest in and to the property described in Section 2 below ("Assigned Property"), TO HAVE AND TO HOLD the Assigned Property for Assignee's use forever. Assignor hereby covenants with Assignee that Assignor is the lawful owner of the Assigned Property, free and clear of all liabilities, liens, charges, encumbrances, and licenses, and that Assignor has the good right to grant, bargain, sell deliver, assign, convey and transfer the Assigned Property to Assignee and will warrant and defend the title thereto until Assignee, its successors, and assigns against the claims and demands of all persons whomsoever.

  2. <u>Assigned Property</u>. "Assigned Property" means Assignor's right, title and interest in and to all proceeds and payment relating to the sale of inventory to FEMA/GSA.

Subsequent to the execution of the LOI, Hue-Mar made sales in excess of $9 million to the United States Federal Emergency Management Agency ("FEMA"), the proceeds of which went directly into Bank of America accounts set up by Freedom Roads. The Bank received funds from FEMA for three sales by Hue-Mar to FEMA. The amounts of monies received, applied and remitted by Bank of America in connection with the FEMA transactions in this case are as follows:

| FEMA Purchase Order No. | P.O. No. 4354 | P.O. No. 4398 | P.O. No. 4430 |
|---|---|---|---|
| Payment from FEMA | $1,224,941.00 | $5,999,400.00 | $2,052,289.93 |
| Total Floor plan Debt Paid With FEMA Proceeds | $ 879,716.30 | $4,053,453.88 | $ 955,354.38 |
| FEMA Proceeds to | $ 345,224.70 | $1,945,946.12 | $1,096,935.55 |

---

[1] The last sentence of the "Assignment" paragraph as written in this memorandum is the exact wording of the October 27, 2005 Instrument of Assignment.

FreedomRoads/subsidiaries

By letter dated March 30, 2006, FreedomRoads informed Hue-Mar that it was no longer interested in pursuing the transaction as contemplated in the signed letter of intent and thereby terminated the agreement. On March 2, 2007, Hue-Mar filed suit in St. Martin Parish against FreedomRoads and Bank of America. The matter was removed to this Court on April 9, 2007. *R. 1*.

## *II. Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(en banc). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id.* If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to

show that there is a genuine issue for trial.[2] *Id.* at 322-23. Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.,* 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144. 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson,* 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.,* 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*III. Analysis*

---

[2] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.*

Pursuant to La. Rev. Stat. § 6:317, Bank of America asserts it is under no obligation toward any party other than its depositor-customers to segregate or remit funds.[3] Because Hue-Mar had no depository relationship with it, Bank of America contends it owed no duty to Hue-Mar. Specifically, the Bank notes that Hue-Mar never executed a deposit account agreement with Bank of America and no deposits were held under Hue-Mar's name. Bank of America maintains that its acceptance of deposits and general assistance to Hue-Mar and FreedomRoads in documenting the consignment relationship did not create a depository relationship in favor of Hue-Mar. Rather, the October Assignment merely created an Assignee-Assignor relationship, basically that of a buyer-seller, and the Retail Agreement was merely the means by which the Bank could have chosen to lend to Hue-Mar's retail customers. Bank of America contends that despite Hue-Mar's assertions that it owns the FEMA sales proceeds, it has no substantive right to any of those proceeds, and thus has no legal right to maintain any claim under La.R.S. § 6:317.

Bank of America further asserts that as Hue-Mar admits executing the consignment contracts, and therefore consented to them, the documents should be enforced as written. In support of its position, Bank of America represents that the jurisprudence provides that "[e]ven error and fraud do not vitiate consent when the

---

[3] La.Rev.Stat. § 6:317 states: A bank may conclusively rely on any application, agreement, or signature card used to establish a deposit account as establishing ownership of any and all funds and other credits deposited therein, and may consider and treat any and all funds on deposit in such an account as belonging to and the sole and exclusive property of the depositor or depositors named on the account application, agreement or signature card, unless otherwise notified or directed by such depositor or depositors.

8

negligent party could have avoided the mistake without difficulty, inconvenience, or special skills," *citing Mobil Exploration & Producing U.S., Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A),* 837 So.2d 11, 25 (La.App. Cir. 2002), and that "[c]ourts are not created to relieve men of their bad bargains made," *quoting Maloney v. Oak Builders, Inc.*, 235 So.2d 386, 390 (La. 1970). *R. 74.*

Finally, Bank of America argues that the terms of the Consignment Agreement and the Consignee Estoppel agreement estop Hue-Mar from asserting any cause of action against Bank of America for failing to account, turn over proceeds, or disclose information to Hue-Mar. Bank of America further argues that even if the contractual provisions are deemed inapplicable, equitable estoppel applies as Bank of America justifiably relied on the veracity of Hue-Mar's representations when it accepted the Consignee Estoppel Agreement and the Assignment of Consignment Agreement.

Plaintiff argues that while it did not sign a deposit account agreement with Bank of America, the evidence submitted by Bank of America "clearly demonstrates a course of dealings and business relationship between Hue-Mar and Bank of America...." Hue-Mar cites the Court's judgment affirming the report and recommendation which denied Bank of America's Rule 12(B)(6) Motion. *R.29, p.6.* There, the Court held: "[A]t the time that FEMA wire-transferred funds in payment for the campers it bought from Hue-Mar into a depository account at Bank of America, Hue-Mar was, in fact, a customer of Bank of America. *Id.*

9

Furthermore, as the executors of the Instrument of Assignment, signed on October 20, 2005, Hue-Mar and Bank of America are parties to a contractual relationship." *Id.* at p.7.

Hue-Mar further argues that Bank of America admittedly received $9,276,630.90 in wire transfers of money owed by FEMA to Hue-Mar, made deposits of these monies into accounts held at Bank of America and transferred $3,388,106.30, representing the profits on those three FEMA sales net of the floor plan loans on the inventory, to various Freedom Roads subsidiaries. Plaintiff contends, that the deposited funds created a customer-depositor relationship with Bank of America who made no effort to protect Hue-Mar's interest in those funds.

Hue-Mar asserts that Bank of America makes the argument that the October 27, 2005 Instrument of Assignment applies to Hue-Mar's first FEMA sale on that date as well as the two additional FEMA sales on January 13, 2006, only because the two January 13, 2006 Instruments of Assignment which the America submitted to FEMA in connection with the second and third FEMA sales are forgeries. Hue-Mar maintains that Bank of America has admitted that it does not have copies of either of the January 13, 2006 Instruments of Assignment actually signed by a representative of Hue-Mar. Hue-Mar further maintains that the Bank's argument that the October 27, 2006 Instrument of Assignment applied to the subsequent sales is disingenuous because if it did apply, neither of the January 13, 2006 Instruments of Assignment would have been needed.

Finally, Hue-Mar refutes Bank of America's argument that the Consignment Agreement governs all sales at Hue-Mar related to inventory received from any affiliate of FreedomRoads because the document was between Hue-Mar and Meyer's RV Centers, LLC only. Thus, Hue-Mar maintains, the inventory it received from the other FreedomRoads' subsidiaries, "Gary's RV Centers, LLC, Grumbine's RV Centers, LLC, Hart City RV Centers, LLC, Holiday Kampers, and Sunbird RV Center, LLC," is not subject to any Consignment Agreement. Further Hue-Mar contends, the Consignment Agreement did not convey to Bank of America the right to dispose of the funds wired by FEMA for sales made by Hue-Mar and neither the Consignment Agreement nor the October 27, 2005 Instrument of Assignment relinquished Hue-mar's interest in the profits on the sale of the inventory to FEMA.

A motion for summary judgment can only be granted if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Before a court can find that there are no genuine issues of material facts it must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Ladue v. Chevron, U.S.A., Inc.,* 920 F.2d 272 (5th Cir. 1991).

In essence, Hue-Mar asserts that it relied to its detriment on the business relationship it had established with Bank of America by executing the forms

11

provided by Bank of America which were related to Hue-Mar's sales to FEMA.[4]

Hue-Mar further asserts that not only did the Bank fail to protect Hue-Mar's interest in its FEMA profits, the Bank forged Hue-Mar's signature on the January 26, 2005 Consignment Agreements related to the second and third FEMA sales.[5]

Bank of America asserts that because Hue-Mar is not a depository customer of the Bank and has no substantive right to any of the FEMA sales proceeds under the contractual agreements it required Hue-Mar to execute, Hue-Mar has no legal right to maintain any claim against Bank of America, most notably under La.R.S. §6:317. Bank of America contends that the contracts executed by Hue-Mar must be enforced even if "error and fraud" are involved.

The Court is disturbed by the serious allegations of forgery in this matter. Moreover, the Court is disturbed by the seemingly cavalier response or lack of response by Bank of America. Bank of America asserts that the situation in this case is just a "bad bargain." *R. 74.* Bank of America's reliance on *Mobil Exploration & Producing U.S., Inc,* 837 So.2d at 25, in contending that fraud, in this case alleged forgery, does not vitiate the contracts executed by Hue-Mar, is

---

[4] "To establish detrimental reliance under Louisiana law, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word, (2) justifiable reliance, and (3) a change in position to one's detriment because of the reliance. LSA-C.C. art. 1967." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 254 (5th Cir.2008)

[5] Hue-Mar filed a Motion for Leave to File Supplemental and Amending Complaint and its Proposed Supplemental and Amending Complaint on March 31, 2008 (*R. 60; 61*) in which it first alleged that the two Bank of America Instruments of Assignment dated January 13, 2006 contained forged signatures of Hue-Mar's CEO, Huey Segura. *R. 61, ¶¶XIV(E), (M), (N), (O); XV; XVI.* The Court granted Hue-Mar's motion on May 14, 2008 the same day that Bank of America filed this Motion for Summary Judgment. *R. 74.* Hue-Mar addressed its claim of forgery in its opposition to the Bank's motion. *R. 101.* Bank of America did not address the forgery claim in its reply brief. *R. 107.*

grossly misplaced. In *Mobil*, the court considered a situation in which a party who had executed a contract and an amended contract with Mobil, attempted to avoid its obligations under the amended contract by contending that Mobil misled it by misrepresenting the extent of the changes to the amended version. *Id. at 24-25.* The court held that the party's unilateral error could not save it from the consequences of an otherwise valid contract when that error is the result of simple negligence. *Id.*

In this case the allegations are not of "simple negligence" or "error" as in *Mobile.* Hue-Mar alleges that Bank of America forged the signature of its representative. The contracts are not valid if the allegations of forgery are established. If there is something akin to fraud or collusion, as Hue-Mar alleges in this case, rather than a "regular and normal banking transaction," the general rule of La.R.S. 6:317 has no application. *Chrysler Credit Corp. v. Whitney Nat. Bank*, 798 F.Supp. 1234, 1241 (E.D.La.,1992) (Clement, J.). Further, as previously held by the Court, the facts and circumstances surrounding this case "clearly demonstrates a course of dealings and business relationship between Hue-Mar and Bank of America" which would establish a duty owed by the Bank to Hue-Mar. The parties each submit different versions of the relevant facts related to the relationship. A case in such a posture is not properly disposed of by summary judgment. Because there are genuine issues of fact to be tried, as described above,

Bank of America's motion for summary judgment on Hue-Mar's claims against it must be precluded.