UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| HUE-MAR, LLC, D/B/A CAMPERS UNLIMITED | * | CIVIL DOCKET NO. 6:07-cv-00635 |
| VERSUS | * | CHIEF JUDGE HAIK |
| FREEDOMROADS OPERATIONS COMPANY, LLC, ET AL. | * | MAGISTRATE JUDGE METHVIN |

**********************************************************************

## REASONS FOR JUDGMENT

**********************************************************************

I.    **Facts**

Plaintiff has requested Written Reasons for this Court's April 27, 2009 Ruling granting a

Motion in Limine to Exclude Evidence of Alleged Forgery, Fraud, and Government Contract

Fraud [Court Doc. 206] filed by Defendant Bank of American N A (hereon "BOA"). The sole

Plaintiff named in the lawsuit is Hue-Mar LLC d/b/a Campers Unlimited (hereon "Hue-Mar").

On September 27, 2005, less than a month after Hurricane Katrina and just a few days

after Hurricane Rita, FreedomRoads Operations Company LLC (hereon "FreedomRoads"), a

Minnesota company with its principal place of business in Illinois, signed a letter of intent (the

"LOI") through its wholly-owned subsidiary, Meyer's RV Centers (hereon "Meyer's"). In the

agreement, FreedomRoads was to purchase all of the assets of Hue-Mar, an Opelousas, Louisiana

retailer specializing in the sale of campers, trailers, and recreational vehicles. Meyer's and Hue-

Mar were the only two entities listed on the LOI. The agreed upon purchase price to be paid by Freedom Roads/Meyer's was $315,000.00, with appropriate adjustments for inventory. Hue-Mar's facilities, staff, and inventory were all based in Louisiana.

Prior to entering into the LOI with Hue-Mar, FreedomRoads entered into a loan agreement with BOA on June 9, 2005 entitled "Floor Plan Credit Agreement" (the "Floor Plan Loan"). The Floor Plan Loan was secured by a security agreement in which FreedomRoads granted BOA a security interest over various types of its property, including FreedomRoads' inventory.

Pursuant to the LOI, FreedomRoads' declared intent was to proceed with the acquisition of Hue-Mar. Hue-Mar subsequently began operating as if the sale would be consummated at a later date. FreedomRoads directed Hue-Mar to deal with FreedomRoads' subsidiary, Meyer's. Hue-Mar had a Louisiana RV Dealers license issued by the Louisiana Recreational and Used Motor Vehicle Commission.

The actual sale of Hue-Mar's assets to FreedomRoads was deferred; instead, the immediate effect of the agreement was to give FreedomRoads access to the high Louisiana market demand for campers, trailers, and RV's through use of Hue-Mar's Louisiana RV Dealers license. FreedomRoads could not begin selling its RV inventory in Louisiana without access to Hue-Mar's RV Dealer's license.

Pursuant to the terms of the LOI, FreedomRoads' representatives began to visit the Hue-Mar dealership in order to provide additional administrative support to Hue-Mar so FreedomRoads, and its subsidiaries, could consign some of their RV inventory to Hue-Mar. Hue-Mar would, in turn, sell that inventory to FEMA. At the time, FEMA sought to purchase and

provide thousands of trailers to hurricane victims who had lost their homes in the storms. Before FreedomRoads could make consignment sales to FEMA through Hue-Mar, FreedomRoads first needed to have their lender, BOA, amend the Floor Plan Loan so that BOA could sell RV inventory to FEMA. BOA subsequently agreed to amend the Floor Plan Loan thereby allowing FreedomRoads and its subsidiaries to consign some of their RV/trailer inventory to Hue-Mar for consignment sale in Louisiana to both retail customers and to FEMA.

In order to amend the Floor Plan Loan, BOA required FreedomRoads to have Hue-Mar execute three contracts to protect BOA's security interest in FreedomRoads' inventory sent to Hue-Mar for sale in Louisiana. On September 28, 2005, Hue-Mar, Meyer's, and BOA executed the contracts: a Consignment Agreement, an Assignment of Consignment Agreement, and a Consignee Estoppel Agreement (collectively, the "Consignment Documents"). FreedomRoads itself was not a party to any of the three Consignment Documents. Instead, Meyer's signed the three Consignment Documents in its capacity as FreedomRoads' wholly-owned subsidiary.

The first contract, the Consignment Agreement, represented an agreement between Hue-Mar and Meyer's whereby Hue-Mar agreed to remit to Meyer's the proceeds resulting from the sale of any vehicles which were part of Meyer's inventory. This included the RV/trailers currently owned by Meyer's at the time and the RV/trailers acquired by Meyer's in the future. The Consignment Agreement further provided that "(Meyer's) may assign all or part of its rights and obligations under this Agreement without consent of (Hue-Mar)." (See BOA's Memorandum in Support of Motion for Partial Summary Judgment, Exhibit B).

The second contract BOA required was the "Consignee Estoppel Agreement." The effect of this agreement was simply for Hue-Mar, as the consignee, to acknowledge its understanding of

3

the Consignment Agreement and further agree to BOA's rights as a floor plan lender.

The third contract BOA required was the "Assignment of Consignment Agreement." The purpose of this agreement was to require Meyer's to assign all proceeds that it would receive from the consigned RV inventory to BOA in order for BOA to collect its floor plan cost and principal borrowings on that inventory.

In effect, the sum of the three Consignment Documents effectively assigned to BOA the proceeds of any sale made by Hue-Mar using campers, trailers, or RV's supplied by Meyer's to Hue-Mar. In other words, the proceeds from the sale of Meyer's inventory by Hue-Mar now went directly to BOA, so BOA could collect its floor plan finance costs and principal loans it had made to FreedomRoads/Meyer's on that inventory.

Upon being introduced to BOA by FreedomRoads, Hue-Mar filled out and delivered to BOA a "Dealer Application" on September 30, 2005 so that it could begin referring customers to BOA for retail financing of their RV's. Hue-Mar was approved by BOA at which point BOA and Hue-Mar executed a "Bank of America Specialty Retail Plan Dealer Agreement," (the "Retail Agreement"). The effect of this contract caused BOA to begin reviewing Hue-Mar's financing agreements and subsequently created a lending relationship between BOA and Hue-Mar's customers under many of those financing agreements.

Subsequent to the execution of the LOI and Consignment Agreement, Hue-Mar and FreedomRoads negotiated the sale of 466 RV units to FEMA that were to occur in three sales under three separate purchase orders (the "FEMA sales"). The total to be paid by FEMA for Hue-Mar's three sales was $9,276,630.93. The first sale of 62 trailers/units occurred on October 27, 2005. The second sale for 300 units occurred on January 13, 2006. The third sale for 104

4

units also occurred on January 13, 2006.

Pursuant to the Consignment Documents, Hue-Mar agreed to assign all proceeds from the October 27, 2005 FEMA sale to BOA. Hue-Mar understood that the proceeds from the October sale would be wire transferred from FEMA to BOA, that BOA would apply the proceeds therefrom to the floor plan loan for the units sold, and that the balance of the funds would then be placed on deposit at BOA. (See Hue-Mar's Opposition to BOA's Motion in Limine to Exclude Any Evidence of Forgery, Fraud, and Government Contract Fraud, pg. 8). In order to inform FEMA of that agreement, Hue-Mar executed an "Instrument of Assignment" dated October 27, 2005 that specifically authorized FEMA to wire the proceeds from the first FEMA sale directly to BOA (the "October Assignment"). Pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727, 41 U.S.C.§ 15, Bank of America then sent a Notice of Assignment to FEMA in order for the proceeds from the first FEMA sale to properly be assigned to BOA. The October Instrument of Assignment was attached to the Notice of Assignment sent to FEMA. Representatives from Hue-Mar, FreedomRoads, and BOA all signed the October Instrument of Assignment and do not contest its validity. Further, Hue-Mar does not seek to recover the $1,224,941.00 paid by FEMA to BOA for the October Sale.

On January 13, 2006, BOA transmitted two Notices of Assignment to FEMA for the second and third FEMA sales. The Instruments of Assignment for the second and third sales were, according to BOA, attached to the two Notices of Assignment. However, FEMA's records show that only the January 13, 2006 Notice of Assignment pertaining to the third and final FEMA sale included the second page. The second page is an acknowledgment page for the FEMA officer to sign indicating that FEMA had received the Instrument of Assignment enclosed

with the Notice of Assignment. The other Notice of Assignment produced from the FEMA file for the second FEMA sale is missing the second page. Both of the January 13, 2006 Notices of Assignment specifically indicated that valid Instruments of Assignment for both the second and third FEMA sales were enclosed in the transmittal. However, FEMA's records are devoid of any Instruments of Assignment relating to the second and third FEMA sales.

In total, FEMA made three separate wire transfers to Bank of America - one for each purchase order/FEMA sale. For each wire transfer, BOA applied a portion of the funds to the loan balances on the inventory sold and then disbursed the balance into accounts held by FreedomRoads. (See Hue-Mar's Opposition to BOA's Motion in Limine to Exclude Any Evidence of Forgery, Fraud, and Government Contract Fraud, Deposition of Kizer, pg. 156).

By email dated March 3, 2006, one of Hue-Mar's members (and signatory to nearly all of the aforementioned documents), Huey Segura, informed FreedomRoads that Hue-Mar was "still in a desperate cash poor situation." (See BOA's Motion in Limine to Exclude Any Evidence of Forgery, Fraud, and Government Contract Fraud, Exhibit 1). Segura's email states:

> "Mark, Dave,
>
> I am not sending this email to Dave's mail box for confidentiality reasons. I know others read his email.
>
> Time is passing, FEMA has paid, and we are still in a desperate cash poor situation with resources promised at a bare minimum at best. In our discussions on this matter during and since December, we have played the shell game financially as you directed us to do, but it is getting to the point where it is unmanageable. You assured us that when the FEMA payments totally almost $10 million rolled in all would be resolved and we could finally close on the purchase of the dealership. Where are we on this? I was assured in January and February that we would have all these things done by March 1, 2006, and there is no evidence of any movement.

When we negotiated this deal, the resources of Freedom Roads and Meyers RV Superstores were the missing ingredients we needed to make this company successful and you promised those resources. The inventory you shipped here during the franchise waiver period and the personnel you brought here made a significant difference and the test run was successful. But, since December you have slowly pulled back those resources a little at (a) time leaving us in a cash poor situation that prevents any ability for us to make headway once we were in our off season. Off season is Christmas through February.

The FEMA orders we procured were a good thing, but it pulled so hard on our cash flow, prepping and shipping all this product, depleted our personnel and financial resources it has left us in a desperate situation that you have been unwilling or unable to resolve. The greatest success we have had since then has been is staying in business while we waited for FEMA payments that were supposed to resolve everything and close the purchase deal. As I have told you repeatedly, we are behind on DMV due to huge and immediate expenses prepping and shipping FEMA units and the long delays in getting MSO's and documents from all the Freedom Roads dealerships and our operational expenses. Also, it needs to be noted and understood that the enormous demands on my service personnel and resources during the FEMA process, our service revenue and relationships with my service customers have been damaged and at this point not recovering. My service business was paying half of my overhead and sometimes more. Now it is almost non existent.

In early January you sent an email that was distributed to all personnel establishing clear chain of command and informing all personnel that Dave would be here 2 to 3 days a month, would be meeting with me to provide pay plans, benefit packages, job descriptions with in 30 days and that 2006 would be a good year where we made Campers Unlimited successful. We are still waiting for this to happen, and my attempts to get these things going have not been addressed and I am very much still in the dark. What ever is going on contrary to all of this is not being shared. I have few or no directives, no business plan and little or no information.

Guys, we are committed to Freedom Roads and Meyers RV Superstores and believe that with the resources we would have as part of the team, we can make this dealership successful. It is impossible to accomplish this in a constant state of damage control. We showed that with small usage of your resources we could have an impact on this market, and if nothing else I have seen the way to taking market share in this area and beyond. We can not do this being starved for resources and playing a game of constantly catching up financially.

This area has its' unique market dynamics as any market does, but it also offers

opportunities that are unique as well. We need to take advantage of those opportunities and right now, we are not able to do so. I believe that we are positioned for further FEMA demands later this year and I also think we still can salvage any momentum we have lost and make great strides in market share with reinvestment and further investment of resources Freedom Roads and Myers RV Superstores plan to provide.

One thing I must add. If we are going to be abandoned; and I sincerely hope that is not happening; we would be left damaged and in much worse shape than when we signed the purchase agreement. Since you took operation, I have staffed up this dealership in certain areas as directed (cutbacks will have to happen), my employees are becoming disgruntled, I am being watched by the DMV and certain creditors due to late payments and outstanding balances, have a hostile relationship with piers in the industry, my insurance carrier is not happy with all the activity that they were not aware of, I have hostile customers due to substandard units sold to them from the Freedom Roads inventory (and you know a lot of it was junk) some of which it takes all my effort to keep them from suing, I have no cash, my landlord is well in the process of purchasing more land to accommodate our grown as per his conversation with us and Dave, and have commitments with advertisers and others based on what was supposed to be, etc. etc.. And, our reputation in the market would be damaged beyond repair given all the advertising and branding we have done over the last 6 months as a Freedom Roads Dealer. These things are looming issues in the event this would happen and I am confident we could not survive them without you resources.

Again, we can make this work. We can own this market. We can make corporate happy. Time, investment and proper management will make this successful. Let's not miss the boat. Time is now.

Huey" (See Hue-Mar's Opposition to BOA's Motion in Limine, Exhibit G).


By letter dated March 30, 2006, FreedomRoads informed Hue-Mar that it was no longer interested in pursuing the transaction set forth in the LOI and terminated the agreement. FreedomRoads/Meyer's stated that Hue-Mar did not use its best efforts to see that FreedomRoads has received the necessary licenses required to operate the business as soon as was reasonably practical, as required by the Closing Conditions contained in the LOI. (See FreedomRoads' Supplemental and Amended Answer, Affirmative Defense III, pg. 1).

8

## II.    Procedural History

On March 2, 2007, Hue-Mar filed suit against Bank of America, FreedomRoads, and

Meyer's RV in the 16th Judicial District Court, St. Martin Parish, Louisiana.  Hue-Mar's

complaint asserted causes of action for unjust enrichment, civil conspiracy between

FreedomRoads and Meyer's to deprive Hue-Mar of its profits, breach of duty of good faith and

fair dealing, failure to equitably distribute profits, failure to pay Hue-Mar monies set forth in the

LOI, and breach of contract.  The matter was removed to this Court on April 9, 2007.

FreedomRoads and Meyer's timely answered Hue-Mar's complaint denying any liability.  Bank

of America filed a Rule 12(b) Motion to Dismiss for Hue-Mar's alleged failure to state a claim

alleging BOA's "only connection" to FreedomRoads and Meyer's was their status as BOA

customers.  Subsequent to the filing of BOA's motion to dismiss, Hue-Mar filed a First

Supplemental and Amending Complaint on May 31, 2007 alleging Hue-Mar had been a customer

of Bank of America and had a multi-faceted business relationship with BOA since September 30,

2005.  On June 8, 2007, FreedomRoads/Meyer's filed a Supplemental and Amended Answer

wherein they asserted Hue-Mar's failure to comply with the Closing Conditions of the LOI

justified FreedomRoads' March 30, 2006 termination letter to Hue-Mar.  Specifically,

FreedomRoads/Meyer's alleged Hue-Mar did not use its best efforts to see that FreedomRoads

had received the necessary licenses required to operate the business as soon as was reasonably

practical, as required by the LOI.  On July 17, 2006, this Court adopted Magistrate Judge

Methvin's Report and Recommendation denying BOA's 12(b)(6) motion and finding that a

relationship did, in fact, exist between BOA and Hue-Mar.  Specifically, this Court held: (1)

Hue-Mar became a customer of BOA at the moment FEMA wired funds to BOA in payment for the campers FEMA bought from Hue-Mar and (2) the existence of the Instrument of Assignment created a contractual relationship between Hue-Mar and BOA. On July 2, 2006, FreedomRoads/Meyer's filed an answer to Hue-Mar's First Supplemental and Amending Complaint denying any liability. On July 18, 2007, BOA filed an answer to Hue-Mar's original complaint and First Supplemental and Amending Complaint denying liability for all causes of action asserted therein.

On March 14, 2008, the deposition of BOA contracting officer Aaron Kizer was taken wherein Mr. Kizer was unable to offer an explanation as to why BOA could not produce valid, signed originals of the January 13, 2006 Instruments of Assignment. On March 31, 2008, Hue-Mar filed a Second Supplemental and Amending Complaint wherein it: (1) acknowledged the validity of the October 27, 2005 Instrument of Assignment, thus, abandoning its claim to the monies relating to the first FEMA sale, (2) alleged BOA committed fraud, mail fraud, or government contracts fraud by virtue of BOA allegedly mailing FEMA the two January 13, 2006 Instruments of Assignment with photocopies of the October 2005 Instrument of Assignment signature page appended to both, (3) phrased its new fraud claim as a delictual action under La.C.C. art. 1953, (4) demanded BOA remit to Hue-Mar the portion of the total payment ($8,051,690.00) plus interest received by FEMA on the second and third FEMA sales which were allegedly misappropriated by BOA through fraud and/or forgery, (5) denied that BOA has a security interest in the proceeds of the second and third FEMA sales, (6) demanded judgment condemning BOA to pay punitive damages under California Civil Code Article 3294, and (7) prayed for attorney's fees and costs pursuant to La.C.C. art. 1958.

On February 17, 2009, BOA filed a Motion in Limine to Exclude Evidence of Alleged Forgery, Fraud, and Government Contract Fraud [Court Doc. 152]. On February 25, 2009, this case was transferred from the Honorable Tucker L. Melancon to Chief Judge Richard T. Haik, Sr. For reasons more fully set forth hereafter, this Court granted BOA's Motion in Limine to Exclude Evidence of Alleged Forgery, Fraud, and Government Contract Fraud [Court Doc. 206] on April 28, 2009. This case is set for jury trial on May 18, 2009.

## III.    Defendant's Contentions

Bank of America seeks to exclude from trial any evidence relating to allegations by Hue-Mar that BOA was engaged in a scheme involving forgery and fraud. BOA contends any evidence concerning alleged forgery and fraud has no probative value and should be excluded as prejudicial.

Hue-Mar's alleged fraud and/or forgery claims for damages are derived from BOA's alleged forging of the two January 13, 2006 Instruments of Assignment (pertaining to the second and third FEMA sales) and/or submitting those allegedly forged documents to FEMA so that FEMA would wire BOA, rather than Hue-Mar, more than $8 million. Hue-Mar's fraud and/or forgery claims do not purport to arise from any contract or other legal relationship BOA has with Hue-Mar. Plaintiff has claimed in its Second Supplemental and Amending Complaint that it has uncovered documents showing that BOA, without authorization, allegedly forged the two January Instruments of Assignment. BOA asserts Hue-Mar cannot prevail on their fraud/forgery claim based on prescription, lack of a cause of action, or lack of standing.

BOA contends Hue-Mar cannot, as a matter of law, sustain any claim for alleged forgery or

fraud as such claims have prescribed. BOA notes that Hue-Mar's Second Supplemental and Amending Complaint styles its forgery and fraud claim as tort claims. BOA cites La.C.C. art. 3492 (delictual actions are subject to a liberative prescription of one year) in support of their argument that Hue-Mar's claims are beyond the boundaries of the one-year prescriptive period for tort claims. BOA argues that Hue-Mar was in full agreement in January and February 2006 that BOA was entitled to receive the FEMA sales proceeds and that BOA would be receiving those sales proceeds directly from FEMA. Additionally, BOA notes that, according to Mr. Segura's March 3, 2006 email to Mark Calzone of FreedomRoads, Hue-Mar had full knowledge at that time that FEMA had paid BOA three separate payments. Yet Hue-Mar waited until March 7, 2007 to file its original Complaint in which Hue-Mar asserted only contractual claims against BOA. BOA points out that it was not until more than two years later, on March 31, 2008, that Hue-Mar sought to file a Second Supplemental and Amending Complaint. This complaint alleges that, contrary to the terms of the Consignment Documents, BOA misappropriated the FEMA proceeds relating to the second and third FEMA sales. The amended complaint also states Hue-Mar's acknowledgment of the October 27, 2005 Instrument of Assignment which permitted FEMA to remit payment for the first FEMA sale directly to BOA.

BOA's next argument contends evidence of alleged fraud and forgery claims should be excluded because Hue-Mar lacks standing to pursue its claims of mail-fraud and government-contract fraud claims. BOA notes that Hue-Mar has not articulated statutory grounds for either of these claims. BOA further notes that Hue-Mar only alleges that BOA committed mail fraud and government-contract fraud by appending the signature page of the October 2005 Instrument of Assignment to the two January Instruments of Assignment and then submitting them by mail

to FEMA. BOA correctly cites the Fifth Circuit case of _Bell v. Health-Mo, Inc._, 549 F.2d 342 (5th Cir. 1977) in which held that the plaintiffs did not have a private right of action under the Federal Mail Fraud statute. BOA recognizes that the Anti-Assignment Act (41 U.S.C. § 15) does potentially provide a basis for an alleged government-contract fraud claim. BOA negates this potential argument by noting that 41 U.S.C. § 15(a) specifically states that, "[a]ll rights of action, however, for any breach of such [assignment] contract by the contracting parties, are reserved to the United States." BOA further contends that none of the myriad of statutes that apply to government-contract fraud, including the Mail Fraud Act (18 U.S.C. § 1031(a)) and the False Claims Act (31 U.S.C. § 3729, _et seq._), would provide a private right of action to Hue-Mar.

BOA's final argument contends evidence of alleged fraud and forgery claims should be excluded because FEMA's administrative record precludes any cause of action for alleged fraud or forgery. Specifically, BOA argues FEMA's administrative record does not even show that the allegedly forged January Instruments of Assignment were ever received by FEMA. BOA believes the key issue on any charges of fraud, whether under state law or federal-contracts law, is (1) whether the January Instruments of Assignment were submitted to the government and (2) if submitted, whether the government relied on them. (See 31 U.S.C. § 3729, La.C.C art. 1953, and _Becnel v. Grodner_, 2007-1041, p. 2 (La.App. 4 Cir. 4/2/08), 982 So.2d 891, 894). BOA attempts to answer these two questions by directing this Court to FEMA's administrative record. First, BOA argues that the administrative record only shows the original October 2005 Instrument of Assignment and Notice of Assignment. BOA notes it does not show the two allegedly fraudulent January Instruments of Assignment that Hue-Mar claims BOA submitted to FEMA. Secondly, BOA points out that, although the two January Notices of Assignment were

sent on January 13, 2006, there exists no record that FEMA actually received the allegedly forged January Instruments of Assignment. Thus, FEMA could not have relied on the allegedly forged January Instruments of Assignment in disbursing the funds to BOA since the allegedly forged documents "were never sent to FEMA." (See BOA's Motion in Limine to Exclude Any Evidence of Forgery, Fraud, and Government Contract Fraud, pg. 8).

## IV.    Plaintiff's Contentions

Plaintiff Hue-Mar's main contention alleges the October Instrument of Assignment should be construed as pertaining *only* to the first FEMA sale. In other words, Hue-Mar contends the October Instrument of Assignment did not give BOA the right to receive the proceeds from the second and third FEMA sales since the two January Instruments of Assignment were allegedly forged. Hue-Mar believes the $8,051,689.93 remitted to BOA for the second and third FEMA sales should be returned to Hue-Mar as these monies were allegedly intercepted by BOA via two Instruments of Assignment that were procured through fraud and/or forgery.

Hue-Mar admits it knew the proceeds from the second and third FEMA sales had been remitted by FEMA as early as March 3, 2006 (date of Huey Segura's email to FreedomRoads). Hue-Mar also recognizes the 1-year prescriptive period for delictual actions under La.C.C. art. 3492. Hue-Mar now asserts that its filing of fraud and/or forgery claims against Bank of America for the first time on March 31, 2008 by way of their Second Supplemental and Amending Complaint (over two years after Segura's email) was not violative of La.C.C. art. 3492 (delictual actions are subject to a liberative prescription of one year) because its fraud

14

and/or forgery claims had not prescribed under the doctrine of *contra non valentem* at that time. Hue-Mar contends it did not have knowledge of the forged nature of the two Instruments of Assignment until September 25, 2007 when BOA produced in discovery the two January Instruments of Assignment both of which bore photocopied signature pages of the *October* Instrument of Assignment. Hue-Mar believes its fraud and/or forgery claims were filed timely because the were filed on March 31, 2008, well within 1-year of their alleged discovery of the forgeries on September 25, 2007. In response to BOA's contention that Hue-Mar should have filed their fraud claim by March 3, 2006 at the latest (one year from Segura's email), Hue-Mar explains that, at the time of the email, "Hue-Mar did not consider itself as the victim of a tort by either FreedomRoads or BOA" even though they admittedly knew BOA had received the funds from all three FEMA sales at that time. (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 21).

Hue-Mar correctly notes that, under Louisiana law, *contra non valentem* may be applied to extend the 1-year prescriptive period of a delictual action such as fraud when "the plaintiff does not know nor reasonably should know of the cause of action." *In re Medical Review Panel Proceeding Vaidyanathan*, 98-0289, p.5 (La.App. 4 Cir. 9/23/98), 719 So.2d 604, 607, writ denied, 98-2674 (La. 12/18/98), 732 So.2d 1238. Though Hue-Mar admits it knew the funds from the second and third FEMA sales had been received by BOA as early as March 3, 2006, Hue-Mar contends it did not know these funds "had been received by BOA due to the submission of forged Instruments of Assignment." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 21). Hue-Mar defends BOA's claim that Hue-Mar's fraud and/or forgery claims have prescribed by stating "prescription is not interrupted until the plaintiff can obtain sufficient

evidence to prove the claim or to corroborate the plaintiff's account of the tort." *Gulf States Land & Development, Inc. v. Ouachita National Bank in Monroe*, 612 So.2d 1031 (La. App. 2 Cir. 1993). Hue-Mar also directs this Court to Federal Code of Civil Procedure Rule 9(b) which provides that in alleging fraud "a party must state with particularity the circumstances constituting fraud or mistake." Under the rationale of *Gulf States* and Rule 9(b), Hue-Mar explains that it did not obtain sufficient evidence to plead its fraud claim with particularity until March 14, 2008 when BOA contracting officer Aaron Kizer was deposed wherein he was unable to offer an explanation as to why BOA could not produce valid, signed originals of the two January Instruments of Assignment. Hue-Mar further states that "had Hue-Mar or its counsel filed a petition speculating that BOA submitted forged document to FEMA, in the absence of any evidence of that occurring at the time, the claim would have been subject to dismissal for failure to plead the claim as required by Federal Rule of Civil Procedure 9(b) and Plaintiff and its counsel would have been subject to sanctions for alleging criminal activity by BOA in the absence of any supporting evidence." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 24).

Hue-Mar's second argument asserts Hue-Mar has standing to assert a claim for the return of $8,051,689.93 that BOA allegedly obtained without a valid assignment, and to assert a claim for punitive damages in conjunction with BOA's conduct which allegedly deprive Hue-Mar of monies it was owed by FEMA.

Hue-Mar contends BOA's argument that Hue-Mar lacks standing is based on a mischaracterization of Hue-Mar's claims. Hue-Mar claims it has "never alleged that BOA is liable for any additional damages due to the fact that BOA's actions involve mail fraud

or...government contract fraud." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 19). Hue-Mar asserts they have standing to recover the $8,051,689.93 which BOA allegedly misappropriated through fraud and/or forgery since Hue-Mar was the party harmed through the misappropriation of these funds. For this same reason, Hue-Mar claims to have standing to assert a punitive damages claim in connection therewith. Hue-Mar admits that, while it seeks recovery of monies misappropriated by BOA, plus interest, attorney's fees, costs, and punitive damages, it does not seek additional damages due to the alleged 'fact' that BOA's conduct involved government-contract fraud and mail fraud. Hue-Mar argues they "merely used government-contract fraud and mail (fraud) to describe for the court the nature of the actions that were taken by Bank of America representatives in their handling of the transactions at issue." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 19).

Hue-Mar's final argument claims FEMA's production of documents is undeniably incomplete, does not constitute an "administrative record," and contains no evidence that BOA submitted to FEMA valid Instruments of Assignment for either the second or the third FEMA sale.

Hue-Mar takes issue with BOA's statement that "the (FEMA) administrative record conclusively shows that the allegedly forged documents were never received by FEMA..." (See BOA's Motion in Limine, pg. 3). Specifically, Hue-Mar contends Katherine Vincent, the Assistant U.S. Attorney making the production on behalf of FEMA, admitted in the response to the requests made by both BOA and Hue-Mar that its record was incomplete. (See Hue-Mar's Opposition to BOA's Motion in Limine, Exhibit E, 9/17/08 Letter from Katherine Vincent). Hue-Mar notes that the documents produced by FEMA relative to the second and third FEMA

sales are both unclear and completely devoid of any Instruments of Assignment whatsoever, "much less what BOA characterizes as conclusive proof that BOA did not send the January 13, 2006 forged Instruments of Assignment to FEMA." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 26). Hue-Mar further notes BOA's admission that the FEMA production of documents relating to the second FEMA sale does not contain a copy of the October 27, 2005 Instrument of Assignment. (See BOA's Motion in Limine, pg. 7). In light of these contentions, Hue-Mar asserts BOA had no right to issue the two January 13, 2006 Notices of Assignment to FEMA due to the complete absence of any proof of valid, signed originals from either BOA's files or FEMA's files.

Hue-Mar states the deposition testimony of BOA Contracting Officer Aaron Kizer indicates his and BOA's practice required that he send FEMA valid duplicate, signed original Instruments of Assignment for each purchase order. Hue-Mar notes that Mr. Kizer maintained that he did submit originals to FEMA despite the fact that there is no evidence that separate, signed Instruments of Assignment were ever obtained from Hue-Mar for the Second and Third FEMA sales and that no evidence of any such documents ever existed.

Lastly, Hue-Mar correctly notes that "(a) government agency is permitted to pay the proceeds due under a contract to an assignee rather than the vendor/assignor only if it was provided with an instrument of assignment conveying the rights to the payment to the assignee."(See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 27; 41 U.S.C. § 15(b); 48 CFR 32.802; 31 U.S.C. § 3727(c)(3)). In light of these requirements, Hue-Mar contends the fact that FEMA cannot account for what happened to FEMA's copies of the two January Instruments of Assignment does not, as BOA contends, "conclusively establish" that Mr. Kizer

did not do what he testified to in his deposition, and what BOA's production of documents related to the January 13, 2006 assignments show.

## V.    Law/Analysis

In order for Hue-Mar to defeat Bank of America's Motion in Limine to Exclude Evidence of Alleged Forgery, Fraud, and Government Contract Fraud, Hue-Mar must show that BOA committed egregious error by *intentionally* forging and/or procuring through fraud the two January Instruments of Assignment. Based on the record before us, this Court cannot find a scintilla of evidence lending itself to proof of *intent* to commit fraud and/or forgery.

### A. BOA Was Authorized to Receive the Proceeds From the January Purchase Orders because the October 27, 2005 Instrument of Assignment Extended to the January Instruments of Assignment As A Matter of Law. Therefore, BOA Never Committed Fraud Relating to Any of the Instruments of Assignment.

The greatest source of disagreement between Hue-Mar and BOA is each parties interpretation as to how far the October 27, 2005 Instrument of Assignment extends. Hue-Mar believes it was only meant to cover the 62 units representing the first FEMA sale. BOA believes it was meant to cover all 466 units, representing the sum total of units sold to FEMA by way of the three FEMA sales. The "(i)nterpretation of a contract is the determination of the common intent of the parties." La.C.C. art. 2045. The Louisiana Supreme Court has further stated that, "to determine the intent of the parties, the court must first look to the words and provisions of the contract." *Amend v. McCabe*, 95-0316, p. 7 (La. 12/1/95), 664 So.2d 1183, 1187. Accordingly, the Court shall first investigate the language of the October Instrument in search of the parties' subjective

intent at the time of their October 27, 2005 signing.

The clear and unambiguous language of the October 27, 2005 Instrument of Assignment section titled "Recitals" states, in pertinent part:

> Paragraph One. "WHEREAS (Hue-Mar) has sold to (FEMA)...*certain inventory* that is the collateral of (BOA); and
>
> Paragraph Two. WHEREAS, (Hue-Mar) has agreed to assign to (BOA) agreed to assign to BOA all of its rights to payments *arising out of the sale of inventory to FEMA*..."

On its face, paragraph two clearly and unambiguously indicates that Hue-Mar, in fact, legally assigned to BOA its rights to proceeds resulting from Hue-Mar's sale or sales of its inventory to FEMA. To the Court, paragraph two cannot be construed any other way. However, to understand the full intent of paragraph two, we must first identify precisely what the "inventory" mentioned in paragraph two is. Does "inventory" literally mean *all* of Hue-Mar's inventory? Or, does "inventory" mean only a smaller fraction of Hue-Mar's inventory? The answer to this question is clearly answered in paragraph one of the "Recitals" section of the October 27, 2005 Instrument of Assignment.

On its face, paragraph one clearly and unambiguously indicates that the "inventory" described in paragraph two refers only to "*certain* inventory" that is the collateral of (BOA). In other words, paragraph one identifies the "inventory" mentioned in paragraph two as "certain inventory." Paragraphs one and two, taken as a whole, literally mean that BOA has a legal right to the proceeds of *any* sale or sales of Hue-Mar's inventory to FEMA whereby the Hue-Mar inventory sold is inventory in which BOA has a security interest. Of course, this begs the question: How many of the 404

20

RV/camper/trailer units sold to FEMA in the second and third FEMA sales were units which BOA had a security interest in? To answer this question, we must look to the Consignment Documents and the LOI.

As previously stated, the Consignment Documents consisted of three contracts all of which were signed on September 15, 2005. The Consignment Documents consisted of an Assignment of Rights and Proceeds (aka the "Consignment Agreement"), a Consignment Estoppel Agreement, and an Assignment of Consignment Agreement. The only three parties to the Consignment Documents were BOA, Hue-Mar, and Meyer's. *FreedomRoads was not a party to any of the three Consignment Documents.* The sum effect of the Consignment Documents effectively assigned to BOA the proceeds of any sale, past or future, made by Hue-Mar using campers, trailers, or RV's (i.e. - inventory) *supplied by Meyer's* to Hue-Mar. In sum, the Consignment Agreement reveals the previously unknown identity of the "certain collateral" described in paragraph two of the October 27, 2005 Instrument of Assignment. There can be no mistaking the fact that *the "certain collateral" in paragraph one was intended by BOA, Hue-Mar, and Meyer's to specifically refer to the Hue-Mar inventory which was supplied by Meyer's.*

Again, "to determine the intent of the parties, the court must first look to the words and provisions of the contract." *Id.* In the instant case, the unequivocal words of the October 27, 2005 Instrument of Assignment and the Consignment Documents, when taken together as a whole, literally mean that BOA, in fact, had a legal right to the proceeds from any of the 404 units sold to FEMA by Hue-Mar which were supplied to Hue-Mar from Meyer's inventory. All parties agree that, in total, 466 units were sold to

FEMA by way of the three FEMA sales. The first sale for 62 units is uncontested by all parties. This leaves a sum total of the 404 units in which the proceeds therefrom are in dispute. Based on the evidentiary record before us, this Court cannot make a determination as to how many of the 404 units were or were not supplied by Meyer's. This quantification is a factual determination for the jury to decide at trial.

BOA's argues section 6(b) of the LOI represents an agreement by Hue-Mar to send the proceeds of *all sales* of inventory sold to FEMA in which the inventory sold was supplied to Hue-Mar by FreedomRoads for sale on consignment. Though this argument may be tenable, the Court cannot conclusively address the validity of this argument at the present time.

BOA notes that, pursuant to the LOI, Hue-Mar agreed to send FreedomRoads 100% of the proceeds of any inventory sold by Hue-Mar which FreedomRoads supplied to Hue-Mar on consignment. While it is uncontested that Hue-Mar, in fact, agreed to abide by section 6(b) of the LOI , the keeping of that promise by Hue-Mar was strictly contingent upon the reciprocal consideration which FreedomRoads promised to Hue-Mar, namely, the promise to purchase the Hue-Mar dealership. "A contract is bilateral, or synallagmatic, when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other." La.C.C. art. 1908. Similarly, "a contract is commutative when the performance of each party is correlative to the performance of the other." La.C.C. art. 1911. In the instant case, the LOI represents a bilateral or commutative contract whereby Hue-Mar promised (1) to sell all of its assets, including the dealership itself as well as their Louisiana RV Dealer's license to

22

FreedomRoads, (2) to supply personnel to FreedomRoads to run the dealership, and (3) to supply costs associated with effectuating the sales of FreedomRoads' consigned inventory to Hue-Mar customers, including FEMA. In exchange for these promises by Hue-Mar, FreedomRoads promised to purchase the Hue-Mar dealership for $315,000.00. Of course, FreedomRoads never purchased the dealership. FreedomRoads now claims Hue-Mar violated the closing conditions of the LOI by failing to provide a valid Louisiana RV Dealer license to FreedomRoads at all times.

The key issue of whether FreedomRoads was justified in terminating the purchase agreement articulated in the LOI is the deciding factor in making a determination as to whether or not the "certain inventory" described in the October 27, 2005 Instrument of assignment includes FreedomRoads' consigned inventory in addition to Meyer's consigned inventory. Unfortunately, the Court cannot address this issue at this time. This is an issue the jury must decide. The jury's factual determination at trial as to whether FreedomRoads was justified in terminating the LOI will determine if section 6(b) of the LOI was violated or not. If the jury decides FreedomRoads' termination of the LOI was justified, then BOA will be deemed to have rightfully been assigned the proceeds relating to all sales to FEMA by Hue-Mar in which both FreedomRoads' *and* Meyer's inventory was sold. On the other hand, if the jury determines FreedomRoads' egregiously terminated the LOI without fulfilling its obligation to purchase the dealership, then BOA will be deemed to have rightfully been assigned the proceeds relating to all sales to FEMA by Hue-Mar in which *only Meyer's* inventory was sold.

It is abundantly clear that, if any of the 404 trailers sold to FEMA *were not*

23

supplied to Hue-Mar by Meyer's or FreedomRoads, then the proceeds from any such sales rightfully belong to Hue-Mar and Hue-Mar only. In the same breadth, if any of the 404 units sold to FEMA _were_ supplied to Hue-Mar by Meyer's, then the proceeds from those such sales should rightfully have been assigned to BOA. Similarly, if the jury determines that FreedomRoads complied with the terms of the LOI when they terminated the LOI, then the proceeds of any of the 404 units sold to FEMA which were supplied to Hue-Mar by FreedomRoads should rightfully have been assigned to BOA.

The potential problem here is that the proceeds from *all* of the 404 units were remitted to BOA. If all 404 units sold to FEMA were supplied to Hue-Mar by Meyer's and/or FreedomRoads *and* FreedomRoads is found by the jury to have not unjustly backed out of the LOI, then there would exist no controversy over who should have properly received the proceeds to the second and third FEMA sales. If the jury finds that FreedomRoads did, in fact, unjustly back out of the purchase agreement, then the only controversy would be over the inventory, if any, that was sold to FEMA by Hue-Mar and supplied to Hue-Mar for consignment sale by Meyer's. (i.e. - BOA's assignment would extend only to the Hue-Mar inventory sold to FEMA which has originally been provided to Hue-Mar by Meyer's). On the other hand, if even one of the 404 units sold to FEMA did not come from Meyer's and/or FreedomRoads' inventory, then Hue-Mar is rightfully owed the proceeds resulting from the sale of those non-FreedomRoads/Meyer's units. FreedomRoads' inventory is obviously comprised of the sum of its own inventory plus the inventory of its many wholly-owned subsidiaries like Meyer's. The same "aggregate nature" does not apply to Meyer's inventory. In other words, Meyer's inventory is just

24

that, Meyer's own inventory. The Meyer's inventory cannot be construed to comprise all of FreedomRoads' inventory because the consignment agreement was signed by Meyer's and *not* FreedomRoads. As such, only the inventory of Meyer's was rightfully assigned to BOA. It is possible that some of the 404 units sold to FEMA consisted of inventory supplied to Hue-Mar by FreedomRoads. If such is found to be the case, then BOA would rightfully be assigned these proceeds. Again, this is an issue for the jury to decide.

For the aforementioned reasons, it is the Court's opinion that the October 27, 2005 Instrument of Assignment, in fact, extended to the January Instrument of Assignment pertaining to the second and third FEMA sales. As such, no fraud and/or forgery was committed by BOA in this case.

## B. Hue-Mar Does Not Have Standing to Assert Its Mail Fraud or Government-Contract Fraud Claims as It Has Abandoned These Claims, Even If the October Instrument of Assignment Did Not Extend To the Second and Third FEMA Sales.

Bank of America contends Hue-Mar has not articulated statutory grounds for any mail-fraud or government-contract fraud claim. This Court agrees. Hue-Mar stated it has "never alleged that BOA is liable for any additional damages due to the fact that BOA's actions involve mail fraud...or government-contract fraud." (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 19). Based on the evidentiary record, the Court cannot agree with Hue-Mar's claim that it is a "fact" that BOA's actions involve mail fraud and/or government-contract fraud. The Court sees no evidence in the record indicating any factual basis for this alleged "fact." Accordingly, the Court finds Hue-Mar lacks standing to assert any claim it may or may not have had against BOA for mail-fraud

and/or government-contract fraud as Hue-Mar has admittedly abandoned all such claims.

**C. Any Fraud and/or Forgery Claim Hue-Mar May or May Not Have Had Prescribed as a Matter of Law, on March 3, 2007 at the Very Latest, Even If the October Instrument of Assignment Did Not Extend To the Second and Third FEMA Sales.**

On March 3, 2006, Hue-Mar's Huey Segura sent an email to FreedomRoads' Mark Calzone wherein Mr. Segura fully acknowledged that FEMA had paid Bank of America three separate payments corresponding to the three FEMA sales. This email clearly indicates to the Court that Mr. Segura knew the funds in dispute had been remitted to BOA *and not Hue-Mar* at this point in time. As such, the prescriptive period to any delictual fraud claim Hue-Mar may or may not have had against BOA under La.C.C. art. 1953 began to run on the date of this March 3, 2006 email, at the very latest, and quite possibly at an even earlier date.

Louisiana Civil Code art. 3492 states "delictual actions are subject to a liberative prescription of one year." Hue-Mar's Second Supplemental and Amending Complaint clearly articulates their fraud claim as a delictual action under La.C.C. art. 1953 (fraud may result from misrepresentation or from silence). La.C.C. art. 3492 states "(d)elictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day the injury or damage is sustained." Hue-Mar claims it has been injured due to the alleged misappropriation of $8,051, 689.93 (relating to the second and third FEMA sales) to BOA which, according to Hue-Mar, were rightfully owed to Hue-Mar because these monies were allegedly assigned to BOA through fraudulent means.

Based on the evidence before the Court, it is uncontested that Hue-Mar knew these

26

funds were remitted to BOA by March 3, 2006 at the very latest. Hue-Mar effectively

had to file its fraud claim by March 3, 2007 before any such claim became time-barred

under La.C.C. art. 3492. Hue-Mar clearly did not file by March 3, 2007. Instead, Hue-

Mar filed its fraud claims for the *first* time on March 31, 2008 via their Second

Supplemental and Amending Complaint. This filing was made more than two years after

the day prescription began to run.

It is worthy to note that Hue-Mar prepared final invoices for all three FEMA sales

which were submitted to FEMA. Each of the three invoices prepared by Hue-Mar

contain Hue-Mar's instructions for FEMA to wire the proceeds to BOA. The invoice

pertaining to the first FEMA sale is dated December 19, 2005. The second and third

invoices are not dated, however both the second and third invoices include attached

facsimile cover sheets dated January 20, 2006 and January 21, 2006 respectively. Though

the dates are missing, the dates on the facsimiles make it more probable than not that

Hue-Mar had knowledge that FEMA sent the funds directly to BOA as early as January

20, 2006 or January 21, 2006. If such is the case, prescription began to run even earlier

than March 3, 2006.

**D. The Doctrine of *Contra Non Valentem* is Inapplicable to Extend the Prescriptive Period For Any Fraud or Forgery Claim Hue-Mar May Have Had, Even if the October Instrument of Assignment Did Not Extend To the Second and Third FEMA Sales.**

Hue-Mar claims its late filing was justified because the doctrine of *contra non*

*valentem* extended the prescriptive period to their fraud claim. Specifically, Hue-Mar

claims it did not have knowledge of the allegedly forged and/or fraudulent nature of the

two January 2006 Instruments of Assignment until September 25, 2007 when BOA produced, for the first time, in discovery the allegedly fraudulent January Instruments of Assignment. Hue-Mar contends they could not file their fraud claim before that time because they did not know about the photocopied and allegedly forged nature of the January Instruments of Assignment until the September 25, 2007 production. Hue-Mar explains why it did not file its fraud claims *at that time* by alleging they could not yet file their fraud claim with particularity. Hue-Mar correctly cites the Federal Code of Civil Procedure Rule 9(b) which provides that when pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity. Hue-Mar allegedly did not have particular enough grounds to file a fraud claim in this suit until they took the deposition of BOA Contracting Officer, Aaron Kizer, on March 14, 2008. According to Hue-Mar, Mr. Kizer stated in his deposition that the January Instruments of Assignment were forged by BOA. Hue-Mar allegedly "could not have (timely) made allegations of fraud against Bank of America in March 2007 without any information concerning the January 13, 2006 Instruments of Assignment, much less any evidence of the forgery or any other basis for a fraud claim" (See Hue-Mar's Opposition to BOA's Motion in Limine, pg. 22). Hue-Mar now asks the Court to apply the doctrine of *contra non valentem* based on this reasoning. The Court finds this argument is not legally sound.

"*Contra non valentem agere nulla currit praescriptio*" literally means prescription does not run against a person who could not bring his suit. *Contra non valentem* "will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know

what he could by reasonable diligence have learned." 12 La. Civil Law Treatise § 10.5, n.1 (200), citing *Cartwright v. Chrysler Corp.*, 232 So.2d 285, 287 (La. 1970). *Contra non valentem* is inapplicable to Hue-Mar's alleged fraud claim because Hue-Mar did not exercise reasonable diligence in investigating the alleged fraud.

If Mr. Segura was *truly* expecting the proceeds from the second and third FEMA sales to be remitted to Hue-Mar, then why does he make no mention of the alleged misappropriation of funds in his March 3, 2006 email? Furthermore, if Mr. Segura was truly expecting these funds, then why did he not contact anyone from FEMA, BOA, or FreedomRoads to investigate the whereabouts of the funds at that time? It would be illogical for a person who believes he has been duped out of over *$8 million* to wait *two years* before ever asserting such a claim.

It is a fact that, on March 3, 2006 at the latest, Mr. Segura *absolutely knew* that the January Instruments of Assignment were accomplished based on the October Instrument or, at a minimum, that they were accomplished without any request of him that he renew the October Instrument of Assignment for collections. The last day for Hue-Mar to file any fraud claim it may or may not have had was March 3, 2006, at the very latest. As previously stated, it is quite likely the prescriptive period ran long before this date based on the January 20, 2006 and January 21, 2006 invoices Hue-Mar sent to FEMA. Regardless, the fact that Hue-Mar waited over two years from the date of the March 3, 2006 email is lethal to Hue-Mar's *contra non valentem* argument in its entirety.

**E. Hue-Mar's Delictual Fraud Claim In Its Second Supplemental and Amending Complaint Does Not Relate Back to the April 9, 2007 Filing of Hue-Mar's Original Petition, Even If the October Instrument of Assignment Did Not Extend To the Second and Third FEMA sales**

Hue-Mar contends Federal Code of Civil Procedure Rule 15(c) allows their Second Supplemental and Amending Complaint to the relate back to the date of its original filing in this Court, April 9, 2007. This argument is not legally sound.

Federal Code of Civil Procedure Rule 15(c) provides, in pertinent part:

> (c) Relation Back of Amendments
>
> (1) When an Amendment Relates Back An Amendment to a pleading relates back to the date of the original pleading when: ...
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set our -- or attempted to be set out -- in the original pleading...

Even if Hue-Mar's Second Supplemental and Amending Complaint did relate back to filing of Hue-Mar's Original Petition in the 16th Judicial District Court on March 7, 2007 or the April 9, 2007 Notice of Removal filed in this Court; both of these dates are over one year past the March 3, 2006 Segura email wherein Mr. Segura clearly had knowledge that the funds relating to the second and third FEMA sales had been directed to BOA at that time.

**F. The Big Picture**

The effect of the Judgment of this Court dates April 28, 2009 is dismissal of any fraud and/or forgery claim, mail-fraud claim, or government-contracts fraud claims Hue-Mar could potentially assert against BOA.

Though Hue-Mar's fraud claim is against BOA is meritless and has clearly prescribed, this Court is highly troubled as to what exactly did happen It is difficult for the Court to rectify (1) that such a significant number of BOA and FEMA internal policies were either ignored or not followed, (2) that no one can find original copies the January Instruments of Assignment, and (3) that such a significant number of vital contracts are, by all accounts, either missing their signature pages or devoid in their entirety of required original signatures.

We are still left with many unanswered questions that only a jury can decide at trial: What effect, if any, would a finding that BOA failed to follow its own policy have on this case? What effect, if any, would a finding that FEMA failed to follow its own policy have? Did FEMA ever receive valid original copies of the January Instruments of Assignments? Did valid original copies of the January Notices of Assignment ever exist in the first place? Why is the Notice of Assignment pertaining to the second FEMA sale missing the acknowledgment page? The missing and/or duplicated status of several key pieces of evidence in this case will certainly give the jury great difficulty in making these factual determinations. What is clear to the Court is that these questions of fact are for the jury to decide, not the Court. The Court need only address the issues relating to the alleged fraud within these Reasons for Judgment.

As previously advised by this Court, a determination of the availability of punitive damages under California Civil Code art. 3294 and any other applicable California law pertaining to exemplary or punitive damages will be made at trial. The Court's determination on this issue will be based on (1) whether or not a relationship existed

between BOA and FreedomRoads and (2) whether the evidence show that BOA willfully ignored their own policy to the detriment of FreedomRoads.

Lastly, the Court has already stated (via both Minute Entry and Teleconference) that Hue-Mar may produce evidence of the alleged actions and/or inactions of BOA as they specifically relate to the disbursement of funds to FreedomRoads as opposed to Hue-Mar. The Court will allow Hue-Mar to discuss the alleged impropriety of BOA's failure to follow its own internal policy. However, the words "fraud" and "forgery" may not be used at trial to describe BOA's actions or lack thereof. Theoretically, fraud potentially may have occurred in this case; however, it is clear that BOA was never a party to any such fraud. As such, any evidence of fraud relating to BOA's actions or lack thereof are hereby excluded from trial. To be clear, *this exclusion applies to evidence of fraud on BOA's part only*.

## VI. Conclusion

For the reasons more fully set forth above, Defendant Bank of America's Motion in Limine to Exclude Evidence of Alleged Forgery, Fraud, and Government Contract Fraud is **GRANTED**.

THUS DONE AND SIGNED in Lafayette, Louisiana, on the /2 day of May, 2009.

CHIEF JUDGE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA